1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

_____
                                                              )
H. DOYL BURKETT,                                  )
                                                              )          No. C06-1021RSL
                                    Plaintiff,          )
                                                              )
          v.                                                 )
                                                              )          ORDER GRANTING DEFENDANT'S
UNION SECURITY INSURANCE             )          MOTION FOR SUMMARY
COMPANY, *et al.*,                               )          JUDGMENT AND DENYING
                                                              )          PLAINTIFF'S CROSS-MOTION
                                    Defendants.     )
_____)

          This matter comes before the Court on "Defendant's Motion for Summary

Judgment" (Dkt. # 34) and "Plaintiff's Motion for Summary Judgment on Liability" (Dkt. # 42).

This is an action under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29

U.S.C. § 1132(a)(1)(B), for payment of long-term disability benefits that plaintiff claims are due

under the terms of an insurance policy issued by defendant Union Security Insurance Company

(formerly known as Fortis Benefits Insurance Company).

          Summary judgment is appropriate when, viewing the facts in the light most

favorable to the nonmoving party, there is no genuine issue of material fact which would

preclude the entry of judgment as a matter of law.  The party seeking summary dismissal of the

case "bears the initial responsibility of informing the district court of the basis for its motion,

and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and

ORDER GRANTING DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT AND DENYING
PLAINTIFF'S CROSS-MOTION

admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).  Once the moving party has satisfied its burden, it is entitled to summary judgment if the non-moving party fails to designate "specific facts showing that there is a genuine issue for trial." Celotex Corp., 477 U.S. at 324.  "The mere existence of a scintilla of evidence in support of the non-moving party's position is not sufficient," however, and factual disputes whose resolution would not affect the outcome of the suit are irrelevant to the consideration of a motion for summary judgment. Arpin v. Santa Clara Valley Transp. Agency, 261 F.3d 912, 919 (9th Cir. 2001); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In other words, "summary judgment should be granted where the nonmoving party fails to offer evidence from which a reasonable jury could return a verdict in its favor." Triton Energy Corp. v. Square D Co., 68 F.3d 1216, 1221 (9th Cir. 1995).

I. STANDARD AND SCOPE OF REVIEW

            The Court has already determined that a *de novo* standard of review applies in this case.  See Order Granting Plaintiff's Motion for Summary Judgment on the Standard of Review (Dkt. # 28).  Under the *de novo* standard, the Court "simply proceeds to evaluate whether the plan administrator correctly or incorrectly denied benefits." Abatie v. Alta Helath & Life Ins. Co., 458 F.3d 955, 963 (9th Cir. 2006).  Before summarizing the relevant facts, however, the Court must determine whether the evidence submitted for the first time by plaintiff during this litigation (*i.e.*, evidence that was not before the administrator at the time it issued its final decision) should be considered.  The Court has discretion, subject to the guidelines set forth in Mongeluzo v. Baxter Travenol Long Term Disability Benefit Plan, 46 F.3d 938 (9th Cir. 1995), to consider additional evidence, but "only when circumstances clearly establish that additional evidence is necessary to conduct an adequate *de novo* review of the benefit decision." 46 F.3d at 943-44 (quoting Quesinberry v. Life Ins. Co., 987 F.2d 1017, 1025 (4th Cir. 1993)).

ORDER GRANTING DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT AND DENYING
PLAINTIFF'S CROSS-MOTION                    -2-

1       In Quesinberry, the Fourth Circuit provided a non-exhaustive list of exceptional

2   circumstances that would justify consideration of evidence beyond the administrative record.

3   The Ninth Circuit has cited the list with approval.  See Opeta v. Northwest Airlines Pension Plan

4   for Contract Employees, 484 F.3d 1211, 1217 (9th Cir. 2007).  Having evaluated the

5   circumstances of this case, the Court finds that they are exceptional only because the advanced

6   imaging equipment that was finally able to pinpoint the organic cause of plaintiff's cognitive

7   problems was not reasonably available until the very end of the administrative process.[1]  The

8   Court therefore finds that it is necessary to consider the Declaration of Gary Stimac, Ph.D (dated

9   September 27, 2007), the oral medical report by Gary Stobbe, M.D. (dated July 25, 2007), and

10  the radiology report from Nevada Imaging Centers (dated December 11, 2006) in order to make

11  an "informed and independent judgment" regarding the coverage determination.  Mongeluzo, 46

12  F.3d at 943.  The other non-record evidence submitted by the parties, including the declaration

13  of plaintiff, has not been considered.

14  **II. FACTS**

15      Although the parties have differing explanations for certain statements and events,

16  the facts of this case are largely undisputed.  On July 20, 1999, plaintiff drove himself to the

17  emergency room complaining of a rubbery feeling in his leg.  As part of his history and physical,

18  plaintiff reported that he was undergoing a lot of stress at work and was even thinking about

19  retiring.  US340.  Because plaintiff's symptoms resolved completely within 30-40 minutes and

20

21

22      [1]  Defendant's attempt to show that the 3.0 Tesla MRI was available throughout the
    administrative process not only fails, but borders on a misrepresentation to the Court.  At most, the
23  websites cited by defendant show that the 3.0 Tesla MRI existed in 2000.  The availability of these
    machines was quite limited, however:  defendant's own evidence suggests that the advanced machines
24  were confined to trade shows and research centers at the time.  Articles from as late as October 2005
    report that 3.0 Tesla scanners were just then making their patient care debut as research machines were
25  "pressed into clinical service."  See http://www.imagingeconomics.com/issues/articles/2005-10_13.asp.

26  ORDER GRANTING DEFENDANT'S MOTION
    FOR SUMMARY JUDGMENT AND DENYING
    PLAINTIFF'S CROSS-MOTION            -3-

there were no continuing signs of cerebellar abnormality, the emergency room doctor surmised that plaintiff had suffered a transient ischemic attack ("TIA") rather than a cerebellar stroke. US342.  A CT scan of the head showed "no acute abnormalities or findings suggestive of an etiology for [plaintiff's] left leg clumsiness."  US343.  Over the course of the next few months, plaintiff reported subsequent episodes of leg weakness that were less severe than the July 1999 event.  US1123.

In September 1999, plaintiff was diagnosed with an abdominal aortic aneurysm. US358.  In December 1999, plaintiff was diagnosed with prostate cancer.  US423.   Plaintiff was advised to "wait and watch" both conditions, a course of action which apparently caused him anxiety.  US 1077.  As recorded by his primary care physician on March 1, 2000:

> Doyl comes in today for a couple of problems.  The major thing is he has been quite anxious since the diagnosis of his prostrate cancer and abdominal aortic aneurysm.  He has been having quite a bit of difficulty concentrating at work. When he gets anxious he begins to feel a pulsation in his abdomen which is real [sic] disconcerting to him.  He actually feels that he is starting to cope better with the above diagnoses. . . .

US 1077.  Dr. O'Quin thought plaintiff's concentration problems were related to his anxiety level and prescribed a trial course of Effexor (an antidepressant) and Ambien (a sleeping pill).

In April 2000, plaintiff pursued treatment options for his prostate cancer.  At the time, he reported to the consulting doctor that he was "doing well" and "has maintained an active and normal life."  US469.  Upon examination, the doctor recorded that plaintiff was a "[w]ell-developed, well-nourished, well-appearing gentleman in not acute distress.  He is cooperative, pleasant, and has very good insight into and recall of his disease."  US470. Plaintiff officially retired (*i.e.*, stopped drawing a salary) from Voldal Wartelle & Co., P.S., on May 1, 2000.

On September 13, 2000, plaintiff had his annual physical exam and again

ORDER GRANTING DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT AND DENYING
PLAINTIFF'S CROSS-MOTION                    -4-

complained of an inability to concentrate.  US1233.  The note from that visit reads in relevant part:

> The only issue that [plaintiff] brings up is that he simply does not feel well.  He cannot really explain it well.  He has had an inability to concentrate.  He has been through several significant health issues and life-changing events recently. . . .  He thought that maybe he would want to go back to work and has found that he really has not been able to concentrate well.  He essentially retired a year ago when all of this started but thought he would be able to go back.  He really did not think much of it but then started thinking about the possibility of disability insurance.  He says he certainly does not want to scam his insurance company and it was actually at the urging of one of his partners, he consider [sic] this.  He called the insurance company to discuss it with them and he said that they encouraged him to file a claim and so he thought he would bring it up. . . .

US1233.  Dr. Larson concluded that plaintiff's inability to concentrate was likely related to his health issues and his recent retirement and hoped that it would improve with time.  Nevertheless, plaintiff indicated that he was going to start the claim process with his disability insurance company and Dr. Larson expressed his willingness to assist with any necessary forms.  US1232.

Between July 1999 and July 2002, plaintiff was in fairly regular contact with various doctors but, except for the two instances discussed above, made no mention of any cognitive problems.  US1050, US1052, US1056, US1058, US1082-84, US1087,  US1210, US1212, US1214, US1216, US1220-25, US1226, US1229, US1230.  In July 2002, plaintiff applied to the Social Security Administration for disability benefits.  He identified "diagnosed stroke, potential of another stroke, abdominal aorta [sic] aneurysm (AAA), prostrate cancer (half of 2000) & Reiters [sic] syndrome" as the conditions that limited his ability to work.  US1353. In particular, plaintiff stated that "when I am stressed I feel the AAA, cannot concentrate, recall or make decisions."  US1353.  On or about December 12, 2002, plaintiff filled in, but apparently did not submit, a disability insurance claim form identifying the same disabling conditions and stating that his illness began in late 1999.  US1349.  Shortly thereafter,  plaintiff again spoke

ORDER GRANTING DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT AND DENYING
PLAINTIFF'S CROSS-MOTION                    -5-

with his doctor regarding the possibility of filing a disability claim:

> We also briefly discussed the possibility of a disability.  Back 2-1/2 to three years ago when he first became ill, he could not concentrate and could not do his job. He thinks he was probably worried mostly about his multiple health issues but really was not able to function.  He considered filing a disability claim then but he said because of the principle of it he did not want to do it.  He did not really think he was fully disabled.  He thought he would get better.  He was talking to someone in the insurance business recently and that prompted him to call his insurance who suggested he truly was disabled and that he would file a claim.  He wants to think about it now but we did briefly discuss whether or not that would be advisable.

US1208.

In January 2003, the Social Security Administration referred plaintiff for a psychological evaluation.  The psychologist, Dr. Goldman, noted that plaintiff's medical history was based on his own report and that he was "a vague and marginally reliable historian." US1027.  Plaintiff performed poorly on the standardized intelligence and memory tests he was given:  his  reasoning abilities and memory index exceeded only 3%  and 0.1% of adults his age, respectively.  US1025-26.  After comparing plaintiff's known activities with his extremely low test results, Dr. Goldman warned that "[t]he current assessment results should be interpreted with caution as the claimant may not have made his best effort on the tasks presented to him." US1025.  A psychiatrist subsequently examined plaintiff and, using a check box format, determined that plaintiff had "psychological or behavioral abnormalities associated with a dysfunction of the brain . . . as evidenced by . . . memory impairments . . . [and] loss of measured intellectual ability of at least 15 IQ points from premorbid levels or overall impairment index clearly within the severely impaired range on neuropsychological testing . . . ."  US1005. In February 2003, the Social Security Administration concluded that plaintiff had been disabled since April 1, 2000, and that he was entitled to disability benefits.  US999.

In May 2003, plaintiff submitted his claim for long term disability benefits to

defendant.  US 181, US1349.  Plaintiff asserted that he stopped working in early 2000 because he and his partners came to the conclusion that plaintiff's inability to concentrate under stress would eventually result in a very costly mistake for Voldal Wartelle & Co., P.S.  US 1363. After requesting additional information regarding medical records and income, defendant denied plaintiff's claim on the grounds that: (1) the insurer was unable to verify that plaintiff was a covered employee at the time he became disabled; (2) the late notice of claim prejudiced the insurer's ability to investigate and determine its coverage obligations; and (3) the evidence provided did not establish that plaintiff was unable to perform the material duties of his job at the time he retired.  US142.  Plaintiff appealed, arguing that the Social Security Administration had already found that he suffers from an organic mental disorder that prevented him from performing the material duties of a Certified Public Accountant as of April 1, 2000.  US977-80. Plaintiff also argued that he was a covered employee, that he provided notice of the claim within a reasonable time, and that the insurer was not prejudiced by any delay.  US980-83.

In August 2005, plaintiff supplemented the administrative record with the neuropsychological report and oral notes of Dr. Glenn Goodwin, the neurological report and oral report of Dr. Gary Stobbe, and the vocational report of Donald Uslan.  US321-33.  After noting that plaintiff made a "gallant effort at producing optimum performance," Dr. Goodwin concluded that:

> it is quite clear that Mr. Burkett would not be able to maintain reasonably continuous employment in his previous work setting as a partner with his accounting firm.  There is fairly compelling evidence of a cognitive disorder that affects processing speed, attention, concentration, and most significantly his memory processing.  He would not be able to be reliable in terms of the type of responsibilities of a senior level accountant.

US528, US534.  Because plaintiff and his wife both reported that plaintiff's symptoms had been consistent over the past four or five years, Dr. Goodwin was unable to explain why plaintiff's

ORDER GRANTING DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT AND DENYING
PLAINTIFF'S CROSS-MOTION                     -7-

2003 test results were significantly worse than his 2005 results.  US533.  During an interview, Dr. Goodwin acknowledged that the neuropsychological testing he completed "is a picture of where [plaintiff] is now.  The only way to determine if this has been a constant thing would be to go back and try to recreate some sort of trail of his status."  US546.  Dr. Strobbe was able to identify a subtle left-hand sensory deficit and noted Dr. Goodwin's finding of visual, rather than auditory, difficulties, both of which would be consistent with plaintiff's oral history regarding a right-hemisphere episode in 1999.  US622, US625.  Mr. Uslan, a rehabilitation counseler, concluded that "Mr. Burkett does not possess the cognitive skills, abilities or durability to maintain or sustain employment, especially as an accountant."  US586.

Nothwithstanding the supplemental evidence, defendant denied plaintiff's appeal. US226-33.  The overarching ground for denial was that, although plaintiff had provided evidence that he was unable to perform his accounting job as of May 2005, "there is no support of disability at the time he stopped working on April 30, 2000."  US226.  Defendant had submitted plaintiff's medical records to a clinical psychologist, Dr. John Shallcross, for review. Although Dr. Shallcross agreed that the neuropsychological evaluation of May 2005 justified a diagnosis of Cognitive Disorder NOS, he concluded that:

> evidence for neurocognitive impairment that would preclude work prior to that date appears speculative and cannot be determined in an objective manner based upon the documentation in the file.  In addition, the testing done by Dr. Goldman was performed almost three (3) years after Mr. Burkett stopped working and Dr. Goodwin's testing was performed over five (5) years after Mr. Burkett stopped working.  Neither of these tests provided any information as to Mr. Burkett's condition around the time he stopped working or supports any limitations existed as of May 1, 2000.

US231.  Defendant concluded that plaintiff's delay in submitting his claim prejudiced its ability to determine whether he was, in fact, disabled at the time he stopped working in 2000.  US232.

In the course of this litigation, plaintiff underwent an MRI using a high field 3.0

ORDER GRANTING DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT AND DENYING
PLAINTIFF'S CROSS-MOTION                    -8-

1   Tesla scanner and obtained an interpretive report from Dr. Gary Stimac, a diagnostic radiologist.

2   After reviewing the CT scan that plaintiff underwent during his emergency room visit in 1999, a

3   less powerful MRI performed in 2004, and the results of the 3.0 Tesla scan, Dr. Stimac

4   concluded that both of the MRI scans showed abnormalities in the basal ganglia, the

5   hippocampus, and the corpus callosum and that these abnormalities were likely caused by a

6   hypoxic/ischemic event or series of events.  Relying on what he calls a "persistent loss of

7   concentration, loss of short-term memory, and inability to perform in his job as a CPA" since the

8   July 1999 event, Dr. Stimac ruled out a number of potential causes for plaintiff's brain

9   abnormalities and concluded that the July 1999 event caused plaintiff's cognitive disabilities.

10  **III. ANALYSIS**

11          The insurance policy at issue requires that the insured provide "written notice of

12  any insured loss within 30 days after it occurs, or as soon as reasonably possible."  US21.  The

13  parties have not identified the precise date on which plaintiff suffered an "insured loss."  The

14  event plaintiff says caused his disability occurred in July 1999, but he was apparently able to

15  compensate for any cognitive problems he was having until January 2000 when he stopped

16  working.  At the very latest, plaintiff suffered an insured loss when he stopped being paid by

17  Voldal Wartelle & Co., P.S. on May 1, 2000.  Nevertheless, plaintiff did not submit a claim

18  under the long-term disability policy until May 2003, three years after the insured loss.  Under

19  these circumstances, the first question the Court must address is whether plaintiff provided

20  notice of his claim "as soon as reasonably possible."

21          According to the claim form submitted by plaintiff in 2003, he retired because he

22  and his partners realized that his inability to concentrate could result in a costly mistake for the

23  accounting firm.  Because the policy defines disability as an injury or sickness which "prevents

24  you from performing at least one of the material duties of your regular occupation" (US5), it

25  appears that plaintiff knew or should have known that he was "disabled" under the policy when

26  ORDER GRANTING DEFENDANT'S MOTION
    FOR SUMMARY JUDGMENT AND DENYING
    PLAINTIFF'S CROSS-MOTION                    -9-

his condition forced him to stop working.  Even if the Court assumes that there was some doubt about the permanence of plaintiff's condition – or that there is some relevant distinction between being unable to perform your job and being disabled – all doubt should have been resolved by September 2000.  At that point, plaintiff had felt unwell for at least a year, had been away from work for nine months, and was contemplating filing a disability claim with his insurance company.  Giving plaintiff every benefit of the doubt (including the latest possible loss date), the Court finds that notice should have been given shortly after the 180-day qualifying period expired on or around November 1, 2000.

An insured's failure to provide notice of a claim as soon as reasonably possible will justify a denial of coverage only if the insurer demonstrates actual prejudice arising from the breach.  Northwest Prosthetic & Orthotic Clinic, Inc. v. Centennial Ins. Co., 100 Wn. App. 546, 550 (2000).

> Actual prejudice requires a showing of some concrete detriment resulting from the delay which harms the insurer's preparation or presentation of defenses to coverage or liability.  A claim of prejudice requires affirmative proof that whatever is lost or changed is material and not otherwise available.  The insurer must be able to demonstrate the specifics of an advantage lost or a disadvantage encountered.  The question is whether the insured's failure to notify prevented the insurer from conducting a meaningful investigation or presenting a viable defense.

Key Tronic Corp. v. St. Paul Fire & Marine Ins. Co., 134 Wn. App. 303, 307 (2006) (internal quotation marks and citations omitted), review denied, 160 Wn.2d 1011 (2007).  Plaintiff argues that, because his experts "have conclusively determined" that plaintiff's current cognitive deficits are related to his 1999 neurologic event (Plaintiff's Motion for Summary Judgment at 22), earlier notice would not have changed defendant's coverage obligations and no prejudice occurred.  Defendant is not, of course, required to rely on the conclusions of plaintiff's experts: if the delay in notification prevented defendant from contesting or rebutting those conclusions,

ORDER GRANTING DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT AND DENYING
PLAINTIFF'S CROSS-MOTION                    -10-

1  prejudice may exist.

2          The key factual issue in this case is whether plaintiff was able to perform the

3  material duties of his job as an accountant in late 1999 and/or early 2000.  The first time plaintiff

4  clearly linked his retirement to cognitive problems was when he applied for Social Security

5  benefits in July 2002.  Until then, the preponderance of the evidence suggests that he retired

6  because of stress and a constellation of physical, not mental, health problems.  To the extent that

7  the July 1999 ischemic attack had any permanent effect on plaintiff's cognitive abilities, the

8  impact was seemingly so mild that plaintiff rarely mentioned it and, when he did so, his doctors

9  thought his symptoms were simply a manifestation of stress.  Other records during this time

10  period suggest that plaintiff was doing well and maintaining a normal lifestyle.

11          The disconnect between plaintiff's scant and very general cognitive complaints in

12  the three years following the 1999 event and his shockingly poor performance on the 2003

13  psychological evaluation raises a serious question of fact regarding plaintiff's abilities at the

14  time he stopped working.  Did the 1999 event produce any organic abnormalities or was it

15  "transient" as diagnosed at the time?  Did plaintiff have a second ischemic attack sometime

16  before the 2003 testing that would account for his poor performance?  Were the 2003 results an

17  anomaly given the improvement seen in 2005?  How does one reconcile the medical records,

18  which seem to indicate decline and improvement, with plaintiff's later statements that his

19  cognitive functioning remained virtually unchanged from the end of 1999 to 2005?  If defendant

20  had received notice of plaintiff's disability claim in November 2000, it would at least have had

21  an opportunity to evaluate his cognitive abilities as of that date.  Instead, defendant must make a

22  disability determination based on a record that barely mentions cognitive problems until 2002

23  and expert reports that, as discussed below, rely almost exclusively on plaintiff's self-history.

24  Defendant has lost the opportunity to investigate the key issue on which its coverage

25  determination depends.

26  ORDER GRANTING DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT AND DENYING
PLAINTIFF'S CROSS-MOTION          -11-

1        Plaintiff cites Kaplan v. Northwestern Mutual Life Ins. Co., 115 Wn. App. 791

2   (2003), for the proposition that, since his experts were able to opine regarding the onset date of

3   plaintiff's disability, defendant's experts should be able to do the same thing.  Kaplan is legally

4   and factually distinguishable from this case.  Legally, the Kaplan court was interpreting the

5   requirement that a claimant be "under the care of a licensed physician," not the issue of

6   prejudice arising from late notice.  The appellate court found that Kaplan's proposed

7   interpretation of the licensed physician clause – that the claimant must be under the care of a

8   physician at the time the claim is made – was reasonable because (a) non-treating experts are

9   often able to ascertain the onset date after a claim is filed and (b) requiring treatment throughout

10  the period for which benefits are sought would be impossible where the insured's illness

11  predates diagnosis.  The Kaplan court did not find that the availability of a post-claim medical

12  evaluation will always alleviate prejudice, regardless of how late notice was given or the facts of

13  the particular case.  In fact, the matter was remanded for a new trial to determine whether the

14  insured timely notified the insurer of his claim and, if not, whether prejudice ensued.

15         Factually, the evidence regarding the date on which plaintiff became disabled is

16  less clear in this case than it was in Kaplan.  Kaplan suffered from obsessive compulsive

17  disorder, a chronic psychiatric disorder from which Kaplan probably suffered, undiagnosed,

18  throughout his life.  Kaplan v. Northwestern Mutual Life Ins. Co., 100 Wn. App. 571, 573

19  (2000).  In the case at hand, everyone agrees that plaintiff's disability is of a more recent

20  vintage.  Plaintiff's experts have opined, and defendant is willing to concede, that plaintiff is

21  currently disabled as a result of organic brain abnormalities that were first documented in 2004.

22  In order to identify the onset date of the brain abnormalities, plaintiff's experts had to "go back

23  and try to recreate some sort of trail of [plaintiff's] status."  US546.  Based almost exclusively

24  on the history provided by plaintiff and his wife regarding unchanging cognitive difficulties from

25  1999 onward, plaintiff's experts concluded that his disability must have arisen in July 1999.  As

26

ORDER GRANTING DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT AND DENYING
PLAINTIFF'S CROSS-MOTION                    -12-

discussed above, however, the contemporaneous medical records suggest little to no impairment from 1999 to 2002, borderline capabilities in 2003, and average to moderately impaired performances in 2005.  Where the factual basis for the experts' conclusion regarding onset date is doubtful, and plaintiff's delay in providing notice of the claim has prevented the insurer from investigating the underlying facts, prejudice exists.[2]

For all of the foregoing reasons, the Court finds that plaintiff's breach of the notice provision prevented defendant from conducting a meaningful investigation of his disability claim.  Defendant's motion for summary judgment is therefore GRANTED and plaintiff's motion is DENIED.  The Clerk of Court is directed to enter judgment accordingly.

Dated this 26th day of December, 2007.

*Robert S. Lasnik*

Robert S. Lasnik
United States District Judge

---

[2]  In light of the Court's finding that defendant has shown actual prejudice with regards to its inability to conduct a meaningful investigation regarding plaintiff's work-related abilities in late 1999 and early 2000, it need not determine whether the factual dispute regarding the date on which plaintiff stopped working is material or otherwise caused prejudice.

ORDER GRANTING DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT AND DENYING
PLAINTIFF'S CROSS-MOTION                    -13-